IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMIR McCAIN a/k/a** **JOHN McCAIN** | : | Civil No. 1:12-cv-0789 |
| Plaintiff, | : | |
| v. | : | |
| **JOHN E. WETZEL**, *et al.*, | : | |
| Defendants. | : | Judge Sylvia H. Rambo |

# M E M O R A N D U M

## I.  Introduction

In this civil action, Plaintiff John McCain ("Plaintiff") filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 on April 23, 2012 while incarcerated in a Pennsylvania Department of Corrections ("DOC") facility. (Doc. 1.) Among other claims, Plaintiff asserts that a violation of his Eighth Amendment rights occurred while being housed at SCI-Waymart in 2010. (*Id*. at 3 of 23.) Defendant Thomas Roegner ("Roegner") filed a motion to bifurcate seeking to address the issue of exhaustion of administrative remedies before holding a trial on the merits of Plaintiff's claims. (Doc. 367.) The court granted Defendant's motion and held a two day bench trial on the issue of exhaustion related to Plaintiff's Eighth Amendment claim. (Doc. 371.) Based on the evidence set forth at trial, the court now sets forth its findings of fact and conclusions of law.

## II.     **Background and Statement of the Case**

Plaintiff initiated this action by filing a complaint in the Middle District of Pennsylvania almost six years ago naming eleven Defendants and levying various claims. (Doc. 1, p. 3 of 23.) Plaintiff's allegations stem from private criminal complaints filed against various corrections officers and subsequent purported retaliatory responses from various other prison officials, including the alleged sexual assault by Roegner. (*Id.* at 3-4 of 23.) He avers that the eleven Defendants in this action destroyed legal documents and personal property, subsequently denied him access-to-courts, violated his First and Eighth Amendment rights stemming from Roegner's sexual assault, and that prison officials failed to adequately investigate, and protect Plaintiff from, the retaliatory sexual assault. (*Id.* at 3-6 of 23.)

On July 2, 2012, Defendants filed a motion to dismiss primarily arguing that Plaintiff had failed to exhaust the administrative remedies required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) (Doc. 20.) The Magistrate Judge issued a Report and Recommendation, which the court adopted, granting Defendants' motion to dismiss in part and denying the motion in part. (Docs. 50 & 64.) The claims against many of the Defendants were dismissed because of a failure to plead proper facts and other deficiencies; however, the claim against Roegner remained because he failed to meet his burden by showing only the types

of complaints Plaintiff filed, rather than a lack of administrative exhaustion. (Doc. 50.) The court, "out of an abundance of caution," allowed Plaintiff to file an amended complaint. (*Id.* at 28.)

To that end, Plaintiff made several attempts and found success in his second and final amended complaint filed on September 24, 2013, which detailed the same allegations as his other complaints. (Doc. 131.) Defendants filed another motion to dismiss arguing that Plaintiff again failed to follow the proper formatting of a complaint, plead sufficient facts to advance his retaliation claims, and identify constitutional protections associated with the manner in which the retaliation was investigated. (Doc. 134, pp. 10-12.) On August 6, 2014, the court issued a Report and Recommendation suggesting that all claims in Plaintiff's second amended complaint be dismissed, excluding the First and Eighth Amendment claims against Roegner. (Doc. 182, p. 19.) The court explained that Plaintiff failed to draw a link between constitutionally protected actions and the alleged retaliation, and that to move forward on the denial of access-to-courts claim he must sufficiently show the contents of the allegedly destroyed documents were accurate or would prove his innocence. (*Id.* at 12, 15.) On October 6, 2014, the court adopted the Report and Recommendation. (Doc. 195.)

Thereafter, the sole remaining Defendant, Roegner, filed his answer to Plaintiff's second amended complaint, and among his eight defenses, Roegner

3

stated that Plaintiff's claims may be barred for failure to exhaust administrative remedies. (Doc. 201, p. 4.) Eight months after filing his answer, Roegner filed a motion for partial summary judgment asserting that Plaintiff failed to exhaust his administrative remedies in regard to his First Amendment retaliation claim stemming from the alleged sexual assault. (Doc. 259; Doc. 261, p. 1). Plaintiff responded with a brief in opposition to Roegner's motion for summary judgment, a proposed statement of uncontested facts, his own motion for summary judgment, and a brief in support. (Docs. 285-287, 289.) On February 29, 2016, the court issued a Report and Recommendation advocating that Roegner's motion for partial summary judgment be granted based on Plaintiff's failure to show that his actions complied with the administrative procedures established by the prison's inmate grievance process or that he had a legally cognizable excuse for not doing so. (Doc. 319, pp. 12-14.) On April 19, 2016, the court adopted the Report and Recommendation (Doc. 328), and less than a month later, the court issued another Report and Recommendation (Doc. 335) denying Plaintiff's motion for summary judgment because of disputed material facts that Plaintiff himself raised, which the court later adopted (Doc. 340).

Over a year later, the court issued a memorandum addressing and denying several of Plaintiff's many motions in this action (Docs. 349, 355, 360) and concluded that all dispositive motions had been decided. (Doc. 363, p. 4.) The

court indicated to Plaintiff that discovery had been completed as of August 2015 (Doc. 268), and the only matter pending was his claim against Roegner for a violation of his Eighth Amendment rights arising from strip searches. (Doc. 363, p. 4.) Subsequently, the court set a date for trial. (*Id.*) On June 2, 2017, Roegner filed a motion for bifurcation and a supporting brief arguing that a bench trial should be held prior to any jury trial to address whether Plaintiff exhausted his administrative remedies when he failed to file a grievance regarding the current Eighth Amendment sexual assault claim. (Docs. 366-367.) Plaintiff responded on June 16, 2017, and requested that the court deny Roegner's motion. (Doc. 369.) On June 22, 2017, the court granted Roegner's motion to bifurcate and scheduled a bench trial on the issue of exhaustion of administrative remedies, which took place on July 24 and 27, 2017. (*Id.*)

At the bench trial, the defense offered evidence that showed that Plaintiff filed several complaints to various prison officials, a majority of which concerned DC-ADM 804 general grievances and not sexual abuse allegations, and one string of letters and correspondence which detailed the allegations against Roegner.

On September 29, 2010, Plaintiff sent a letter addressed to James C. Barnacle ("Barnacle"), Director of the Office the Office of Special Investigations and Intelligence ("OSII"), detailing allegations that corrections officers were denying Plaintiff showers, yard, and access to the law library as well as threatening

bodily harm. (Trial Tr. Aug. 24, 2017, pp. 8-9.) The letter was forwarded to OPII and dismissed for not sufficiently citing enough detail to start an investigation based on the allegations. (*Id*. at 11-12.) OPII sent a form letter to Plaintiff to this effect on October 5, 2010. (*Id*. at 12.) A courtesy copy was also sent to Superintendent Nish of SCI-Waymart, where Plaintiff was being housed. (*Id*. at 13.) In response to the request for more details, Plaintiff sent a letter dated October 14, 2010 back to Barnacle stating allegations similar to that of the first letter, but this time identifying several corrections officers, including Roegner, but never connecting Roegner to abuse or assault. (*Id*. at 15-16.) The letter along with the allegations were forwarded to Superintendent Nish and investigated. (*Id*. at 18.) During the investigation, McCain signed a statement asking to be removed from Roegner's area for "security reasons." (*Id*. at 19-20.) This statement was not enough to trigger action outside of the internal investigation. (*Id*. at 21.)

On March 21, 2011, Wayne County District Attorney sent Plaintiff, with copies to Barnacle and Superintendent Nish, a letter addressing a private criminal complaint Plaintiff filed against Roegner on February 1, 2011. (*Id*. at 25.) The letter stated that the complaint would be forwarded to OSII (formerly the Office of Professional Responsibility ("OPR"))[1]. (*Id*. at 26.) Plaintiff's complaint attached to the letter outlined the allegations in the September correspondence to Barnacle and

---

[1] It was noted during the hearing that the Office of Professional Responsibility changed its name to Office of Special Investigations and Intelligence between 2010 and 2011. (*Id*. at 7.)

6

the subsequent investigation of the denial of shower, library, yard, and the additional general abuse allegations made against Roegner. (*Id*. at 28.) The complaint continues to allege that, subsequent to the investigation and Plaintiff's statement stemming from the October 14, 2010 letter to Barnacle, Roegner committed "sexual harassment, sexual abuse, threats, and sexual assaults . . . from October 18th, 2010, through November 18th, 2010." (*Id*.) Chief of Investigations of OSII, Harold Kertes ("Kertes") responded by assigning the incident with an abuse number and forwarded the investigation to a security lieutenant at SCI-Waymart. (*Id*. at 31.)

The letter forwarding the investigation to SCI-Waymart was done so pursuant to the Inmate Abuse Allegation Monitoring Process and administrative procedures manual DC ADM-001. (*Id*. at 34.) After the investigation was performed, the results were received by Kertes at OSII for review and approval on May 18th, 2011. (*Id*. at 38-40.) The investigators at SCI-Waymart concluded that the allegations were unfounded and the OSII review agreed with this determination (*Id*. at 42, 46.) On June 15, 2011, Kertes sent a DC ADM-001 closing letter to Superintendent Nish notifying him of the approval of the outcome. (*Id*. at 49-51.) Superintendent Nish was required to inform Plaintiff of the investigation's findings and that the matter would be closed (*Id*. at 51.) Again, the letter stated that an investigation was performed in accordance with the inmate abuse allegation

7

monitoring process, and OSII reviewed the investigation and found the process and outcome satisfactory. (*Id*. at 52-53.)

On August 5, 2011, after receiving the determination, Plaintiff sent a letter to Secretary of Corrections Wetzel ("Secretary Wetzel") concerning the same alleged sexual assault. (*Id*. at 52.) The matter was referred to OSII because any communications that allege sexual abuse received by any staff member are immediately forwarded to OSII. (*Id*. at 54.) On September 1, 2011, Plaintiff sent another letter to Secretary Wetzel asking for an update on the investigation as well as his previous letter. (*Id*. at 54-55.) Finally, on September 21, 2011, OSII sent Plaintiff a letter in regard to the August 5th correspondence to Secretary Wetzel stating that Plaintiff's allegations were previously investigated and that they were unsubstantiated. (*Id*. at 55-56.)

## III. Discussion

### A. Administrative Exhaustion Under the PLRA

The PLRA mandates that before prisoners may bring a civil claim in federal court they must first address their concerns through the administrative grievance process and procedures available to them in jail or prison. The Act explains that, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

8

exhausted." 42 U.S.C. § 1997e(a). This requirement applies to all grievances or claims regarding any aspect of prison life no matter the type of the relief sought. *See Petrucelli v. Hasty*, 605 F. Supp. 2d 410, 419 (E.D.N.Y. 2009) (providing that the PLRA's exhaustion requirement applies to *Bivens* claims.); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). While this exhaustion requirement is not a jurisdictional bar to litigation, the requirement is strictly enforced by the courts and is mandatory before filing suit. *See Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).

Additionally, courts have imposed a procedural default component on this exhaustion requirement holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. *Spruill v. Gillis*, 372 F.3d 218, 228-30 (3d Cir. 2004). Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating clams in federal court. *See, e.g.*, *Booth v. Churner*, 206 F.3d 289, 299-300 (3d Cir. 2000); *Bolla v. Strickland*, 304 F. App'x 22, 23-24 (3d Cir. 2008). Thus, an inmate's own delay in filing or failure to abide by the mandated grievance procedures will not be excused. *Woodford v. Ngo*, 548 U.S. 81, 84-95 (2006). However, courts relax this requirement under a few

exceptions, including when prison officials' actions directly result in an inmate's procedural default of a grievance. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002). Similarly, "[w]here [the inmate] failed to receive even a response to the grievances addressing the . . . incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." *Small v. Camden Cty.*, 728 F.3d 265, 273 (3d Cir. 2013). Even with such an impediment, once the barrier to filing a grievance is removed, the inmate is subject to the requirements of proper exhaustion. *Oliver v. Moore*, 145 F. App'x 731, 735 (3d Cir. 2005).

Importantly, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." *Warman*, 49 F. App'x at 369; *see also Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000) (concluding that the exhaustion requirement was satisfied where OPR fully examined the merits of excessive force claim and found clear evidence that correctional officers impeded the filing of a grievance).

In the absence of clear and available proof that an inmate was misled by correction officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with the statutory exhaustion requirement. *Harris v. Armstrong*, 149 App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely claiming that the DOC policies were not clearly explained to him. *Warman*, 49 F. App'x at 368. Thus, an inmate's confusion regarding a particular grievance procedure does not, without more, excuse a failure to exhaust. *Casey v. Smith*, 71 F. App'x 916, 917-18 (3d Cir. 2003); *see also Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing.'"). Finally, even when inmates perceive the system and exhaustion of administrative remedies as futile it does not excuse compliance with the PLRA's requirements. *Nyhuis v. Reno*, 204 F.3d 65, 72 (3d Cir. 2000).

**B.** **<u>The Prisoner Grievance System</u>**

Upon entering a Pennsylvania Department of Corrections ("DOC") institution, an inmate receives a handbook which provides information concerning the operations of the facility and how inmates may address a variety of problems

11

they may encounter. *See, e.g.*, DOC Inmate Handbook, 2017 Edition, www.cor.pa.gov/.../Documents/DOC%20Policies/2017%20DOC%20Inmate%20Handbook. Two policies and procedures are implicated by the facts that came to light at Plaintiff's evidentiary hearing concerning the issue of administrative exhaustion: DC-ADM 804 and DC-ADM 001. (Docs. 393, 394.) The following outlines the two systems and how they interact with each other.

### 1. DC-ADM 804

42 U.S.C. § 1997e(b) mandates that states adopt an administrative grievance procedure in their correctional institutions. In Pennsylvania, the DOC, through the Bureau of Prisons, has established DC-ADM 804, a three-tier grievance system that inmates may use to air complaints that could not be addressed through other procedures. (Trial Tr. Aug. 24, 2017, p. 92.) The policy dictates a specific procedure that both the inmate and the institution must follow.

First, an inmate must file an initial grievance. Once a grievance is received, it is entered into an automated grievance tracking system, which assigns it a number. The grievance is subsequently investigated and a response is sent to the inmate from the facility grievance coordinator at that facility. (Trial Tr. Aug. 24, 2017, p. 96.) Next, if the inmate is dissatisfied with the response, the inmate may appeal to the facility manager, *i.e.*, the superintendent. (*Id.*) Finally, the inmate may appeal to DOC's central office. (*Id.* at 111.) The policy lays out strict

time and content requirements for a grievance and subsequent appeals to be considered proper. (Def. Ex. 13.) This policy is available in writing at the library and in the inmate handbook, which is given to each inmate upon entry to the facility. (Trial Tr. Aug. 24, 2017, p. 92). While the policy was enacted to address a wide range of inmate concerns, it is not meant to handle emergencies or events of an urgent nature. (*Id*. at 93-94.) Staff, including the inmate grievance coordinator, collects grievances on a daily basis either by hand or through a system of lockboxes located around the prison. (*Id.* at 95.) This enables all prisoners to file grievances, including those in the more heavily guarded areas such as Restricted Housing Units ("RHU"). (*Id*. at 94-96.)

As the policy states, DC-ADM 804 was enacted to address a wide array of inmate grievances, but it is not the exclusive avenue for inmate complaints as the DOC has adopted other policies in which to handle more specific types of accusations or events in the prison. (Def. Ex. 13, p. 4 of 18.) Examples include policies to address inmate-on-inmate violence or abuse, placing inmates in administrative custody, and non-physical allegations against guards. In addition to the examples above, DC-ADM 804 establishes a separate policy for allegations of abuse entitled DC-ADM 001, "Inmate Abuse Allegation Monitoring Process." (Def. Ex. 13, p. 7; Trial Tr. Aug. 24, 2017, p. 97.)

13

### 2. DC-ADM 001

Sexual and physical abuse in jails and prisons is something that administrative officials and those that work in correctional facilities take seriously. (Trial Tr. Aug. 24, 2017, p. 126; Def. Ex. 1, p. 3.) In 2006, Congress took action and enacted the Prison Rape Elimination Act ("PREA") to further combat this problem. Before the DOC adopted PREA in 2014, DC-ADM 001 acted as the policy that dealt with inmates' allegations of sexual and physical abuse. The subject of policy DC-ADM 001 is "Inmate Abuse Allegation Monitoring," and "[t]he purpose of this document is to establish policy and procedures for the reporting and investigation of allegations of inmate abuse." (Def. Ex. 1.) To this end, the DC-ADM 001 filing process is much less stringent in its requirements compared to the grievance procedures under DC-ADM 804. (Trial Tr. Aug. 24, 2017, p. 36.) The policy provides inmates with multiple avenues to report abuse: 1) report it verbally or in writing to any staff member; 2) file a grievance in accordance with Department policy DC-ADM 804, "Inmate Grievance System;" or 3) report it in writing to OPII. (Def. Ex. 1, p. 4.) Additionally, any person who has knowledge of abuse may notify staff or the Central Office of the DOC and, in turn, staff and the Central Office are required to forward these allegations to the facility's Security Office or the OPR. (Def. Ex. 1, p. 4.)

After detailed allegations are received through any of the channels mentioned above, they are assigned an abuse number and investigated by OPR or the facility's Security Office. (Trial Tr. Aug. 24, 2017, p. 31.) The DC-ADM 001 dictates clear provisions for timing, content, and review of the investigation. (*Id*. at 34, 38-39.) If the facility's Security Office performs the investigation, and it is approved by OPR, they notify the inmate of the outcome. If OPR performs the investigation, they send letters to the institution and inmate directly. (*Id*. at 50-51.)

### 3. Interaction between DC-ADM 804 and DC-ADM 001

DC-ADM 804 requires that "[a] grievance dealing with allegations of abuse shall be handled in accordance with Department policy DC-ADM 001, 'Inmate Abuse Allegation Monitoring Process.'" (Def. Ex. 13, p. 7.) DC-ADM 804 also dictates that policies that do not fall within its purview be disposed of in accordance with the procedures outlined in those policies and that DC-ADM 804 is not applicable (Def. Ex. 13, p. 13.)

### C. **Exhaustion of Administrative Remedies in Pennsylvania Prisons: DC-ADM 001**

Roegner's argument, that Plaintiff's claim should be barred for failure to exhaust administrative remedies, stems from the factually accurate assertion that Plaintiff did not file any DC-ADM 804 grievances alleging sexual assault, nor did Plaintiff initiate the subsequent two stage appeals process which is traditionally required to exhaust administrative remedies in Pennsylvania correctional

15

institutions. However, after review of the policies themselves, as well as the explanations and evidence adduced during trial, no testimony resolved the issue of whether DC-ADM 804 is the only avenue in which inmates may exhaust administrative remedies for claims of abuse, and whether DC-ADM 001 is an alternate means of exhaustion. Many courts have grappled with this issue and several have found that inmates complaining of abuse have other means to address this grievance through DC-ADM 001. However, most of these cases were dismissed because exhaustion was only analyzed under DC-ADM 804. (Doc. 195, p. 22). Even with a lack of case law on the matter of DC-ADM 001 as an alternate means of exhaustion, a few cases have broken through the mire and shed light on the issue.

While the Third Circuit in *Victor v. Lawler*, 565 F. App'x 126 (3d Cir. 2014), declined to decide whether exhaustion of administrative remedies was possible by filing a grievance under DC-ADM 001, it recognized the existence of district court precedent finding exhaustion through DC-ADM 001 possible. The court elaborated that if exhaustion was possible under DC-ADM 001, an inmate could not file a complaint in federal court until after the inmate received a determination from the subsequent investigation. *Victor*, 565 F. App'x at 129. Since *Victor*, Pennsylvania district courts have held that once inmates file a complaint pursuant to DC-ADM 001, and the investigation is completed, they have

exhausted their administrative remedies. *See Moore v. Lamas*, Civ. No. 12-cv-223, 2017 WL 4180378 (M.D. Pa. Sept. 21, 2017) (holding that DC-ADM 001 was an appropriate administrative remedy that an inmate could use to exhaust his claims, specifically rejecting that reporting abuse under DC-ADM 001 was an initiation mechanism requiring further exhaustion under DC-ADM 804); *Camacho v. Dean*, Civ. No. 14-cv-01428, 2018 WL 2225177, *29-30 (M.D. Pa. Apr. 9, 2018) (finding that DC-ADM 001 may provide an alternative means for plaintiff to exhaust his use-of-force claim based on sexual assaults); *Pressley v. Huber*, Civ. No. 08-cv-0449, 2018 WL 1079612, *28 (M.D. Pa. Jan. 11, 2018) (recommending that plaintiff properly exhausted his claim under DC-ADM 001 before filing suit).

Under the backdrop of these cases, this court must decide whether Plaintiff exhausted his administrative remedies. It is undisputed that Plaintiff did not exhaust his administrative remedies under DC-ADM 804 because he never filed this type of grievance against Roegner. (Def. Ex. 15, 19-21.) However, Plaintiff did more than file a complaint under DC-ADM 001 and, therefore, properly exhausted his administrative remedies. Because the DC-ADM 001 policy promotes the reporting of sexual abuse in a broad number of ways, Plaintiff's private criminal complaint that was forwarded to OSII, the investigation that followed, and the notification of the outcome to plaintiff satisfies the exhaustion requirement under the PLRA. Plaintiff took an additional step to exhaust his

17

administrative remedies by attempting to seek relief by sending a letter to Secretary Wetzel and received a determination from OSII that his allegations were unsubstantiated. Whether through the forwarding of the private criminal complaint, or the letters to Secretary Wetzel, Plaintiff took the single step necessary under DC-ADM 001 and waited for a determination. After Plaintiff received a determination from OSII, he had properly exhausted his administrative remedies and could rightfully seek relief through the filing of a federal complaint.

## IV. Conclusion

For these reasons, the court finds that Plaintiff has exhausted his administrative remedies pursuant to DC-ADM 001. An appropriate order will issue.

                                          s/Sylvia H. Rambo
                                          SYLVIA H. RAMBO
                                          United States District Judge

Dated: July 17, 2018